Filed 9/20/21  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HENRY ELVIS LOPEZ,<br><br>    Defendant and Appellant. | D077199<br><br><br>(Super. Ct. No. SCD274893) |

APPEAL from a judgment of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed.

Charles M. Sevilla for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Collette C. Cavalier, Deputy Attorneys General, for Respondent

This heartbreaking case concerns the death of two young children who perished in the middle of the night in a house fire.  After investigators concluded that the deaths were caused by the negligence of their intoxicated father Henry Lopez, the District Attorney charged him with involuntary

manslaughter, felony child abuse, and recklessly causing a fire that resulted in the deaths of his seven-year-old daughter and ten-year-old son. Following a five-day trial, a jury convicted Lopez of all counts. Thereafter, the court sentenced Lopez to 12 years and eight months in state prison.

Lopez challenges the convictions on several grounds. He asserts (1) insufficient evidence supports the convictions on the issue of causation; (2) the opinions of two prosecution expert witnesses were based on false evidence; (3) the trial court improperly admitted video of an experiment conducted by one of the prosecution experts; (4) the court erred by refusing an instruction Lopez requested concerning alleged flaws in the prosecution experts' testimony; (5) the court erred by failing to allow additional investigation of alleged juror misconduct; and (6) the court erred by allowing inflammatory testimony by Lopez's ex-wife, the deceased minors' mother. In addition, Lopez contends that even if these errors individually do not require reversal, cumulatively they do. As we shall discuss, we reject each of Lopez's appellate contentions and affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

Lopez was married to Nikia L., the mother of the minor victims, in 2007. The couple's son Cristos was born the same year and their daughter Isabella was born three years later. By 2015, Lopez and Nikia were experiencing marital problems and Lopez was drinking heavily. The same year, Nikia was diagnosed with breast cancer. Lopez attended Alcoholics Anonymous meetings and told Nikia that his drinking stemmed from post-traumatic stress after his time in Marine bootcamp and because he had been molested as a child. Nikia also suffered several miscarriages that strained the couple's relationship and that Nikia testified intensified Lopez's alcohol

2

abuse.  The couple separated in 2016 and thereafter shared custody of the children.

On Friday, October 27, 2017, while the children were in Lopez's care, he took them to a Halloween carnival at their school.  They all returned to Lopez's townhome around 8:00 p.m.  Cell phone and Facebook records showed Lopez and his girlfriend, Laneisha Y., were texting and messaging over the subsequent few hours and were engaged in a heated argument.  At one point Lopez sent a message telling Laneisha he was cancelling his plans to drive to Ontario, where Laneisha lived, with the children the next morning to attend a family party.  Laneisha blocked Lopez's angry texts.  Lopez's last message to Laneisha that night was sent around midnight.

Around 3:00 a.m. a driver passing by the townhome saw flames coming from the balcony.  The passerby stopped his car, got out, and ran toward the fire.  He heard banging and a man yelling, and called 911.  Around the same time, Lopez's next-door neighbor was awakened by banging and yelling.  The neighbor also called 911 and while on the phone with the dispatcher began to smell smoke.  She then saw flames coming from Lopez's balcony.  Firefighters arrived shortly after and saw the balcony engulfed in flames.

The first firefighter to enter the home noticed blood on the front door and a shattered window next to the door.  The firefighter reached through the broken window to open the locked door.  The first floor of the townhome was clear, so the firefighter and his partner moved up the stairs.  The first firefighter discovered Lopez lying unconscious near the top of the stairs.  The firefighters carried Lopez outside and medical personnel provided him oxygen.  Lopez was incoherent and unable to respond to their questions.

The smoke on the second floor of the townhome was thick, limiting visibility to just a foot above the floor.  A third firefighter entered the

3

townhome and found Cristos on the second floor just inside Lopez's bedroom, lying face down with his legs curled under him. The firefighter carried the boy outside and placed him on a stretcher. A fire captain searched for additional victims and found Isabella lying on the bottom bunk of bunkbeds in Cristo's bedroom. The captain carried Isabella outside and handed her to another firefighter who laid the girl down next to Lopez. Isabella was unresponsive and emergency personnel began cardiopulmonary resuscitation.

Both children perished the night of the fire. Isabella died from smoke inhalation. Over 80% of Cristo's body was burned. The medical examiner determined his death was caused by burns and smoke inhalation. Lopez was severely burned and suffered inhalation injury. He was placed in a coma and kept on a ventilator in the intensive care unit until November 9, 2017. He was released from the hospital on November 15, 2017.

Lopez's blood was drawn and collected at 4:52 a.m. in the immediate hours following the fire. Testing showed that at that time of the blood draw, Lopez had a blood alcohol concentration of 0.229 percent. Using a retrograde extrapolation, a police criminologist determined that Lopez's blood alcohol concentration at 3:15 a.m. would have been between 0.244 to 0.259 percent, three times the legal limit for driving.

After the fire, the San Diego Metro Arson Strike Team (MAST) sent fire engineer Wayne Whitney to determine the origin and cause of the fire.[1]

---

[1] MAST is the fire department "unit tasked with investigating fires and explosion[s] in the City of San Diego proper. It consists of members of the fire department, police department, and ATF." Whitney stated when MAST is called to a fire, two fire department employees respond, "[t]he fire engineer, which was [Whitney in this case], and a fire captain …. The fire engineer's responsibilities, once at the scene, are to conduct … a scene exam, take photos, [and] document [the] scene. And ultimately [make] a determination and expert opinion as to what caused the fire."

Whitney testified at trial that he evaluated the damage patterns in the townhome to find where the fire originated. Whitney explained he also identified all potential ignition sources and eliminated those that could be excluded as the cause of the fire.

During his investigation, Whitney first noted smoke damage, but no fire damage, in the children's bedrooms near Lopez's master bedroom. He then examined the master bedroom where the majority of smoke and fire damage was located. Based on his observations, Whitney determined the fire originated in the master bedroom at or near the upper right hand corner of Lopez's four poster bed. The fire completely consumed portions of the mattress and box spring, as well as parts of the headboard and bed frame. The floor and the metal bed frame underneath the bed were relatively intact, indicating the fire started on top of, rather than underneath, the bed. There was a latex or polyurethane mattress topper on the bed, which Whitney testified poses a high risk of fire danger once ignited.

Whitney found no evidence that the fire originated on the exterior balcony attached to Lopez's bedroom. Whitney also eliminated potential electrical causes of the fire through his examination of all of the outlets in the room and related wiring. A folded cell phone charging cord, which Lopez's girlfriend identified as one that she purchased for him, was plugged into an outlet on top of a bar away from the bed, but with no device attached to the charging cord. Whitney opined that if the cord or an attached phone had caused the fire, he would have expected to find an attached device (or its remnants) or damage to the cord, and would also have expected to see evidence of damage at the end of the cord or to the insulation covering the wires. Because the cord was not damaged, Whitney eliminated it as the

origination point for the fire. A cup containing wax and a candle found on the dresser were also both eliminated as potential causes.

Simultaneously with Whitney's investigation, the San Diego police initiated a homicide investigation. Police sergeant Christopher Leahy was assigned to the case. When he visited Lopez's townhome he observed the broken window and shattered glass next to the front door. He found blood on the glass and a five-gallon water jug just inside the house. Blood was also smeared on the wall near Cristo's bedroom. Leahy also found holes in the drywall near Cristo's room. Leahy visited an unconscious Lopez in the hospital, and saw he had a large laceration with stiches on his right hand and arm. Testing later confirmed that the blood in the house and on the broken glass was Lopez's. Although Leahy was initially concerned that an intruder might have entered the home and intentionally set the fire, after his investigation he concluded Lopez had likely shattered the window, lacerating his arm, and then gone back upstairs for the children.

Leahy also discovered two empty 24-ounce cans of beer in the garbage container under the kitchen sink, and an empty bottle of gin downstairs. Two empty American Spirit cigarette packages—the brand Lopez smoked—were found in a garbage can in the garage along with a drinking glass filled with cigarette butts, an empty matchbook, an empty bottle of whiskey, an empty bottle of wine with cigarette butts and ashes inside, and another empty gin bottle. Investigators also found a glass marijuana pipe, a lighter, and a cigar cutter in the home. A burned glass cup, similar to the cup filled with cigarette butts found in the garage, and a partially melted plastic whiskey bottle were found on the floor near Lopez's charred bed.

During trial, Nikia testified that Lopez had not been a smoker during their relationship, but had started smoking after they separated. She had

seen cigarettes in his house and had also witnessed Lopez smoking marijuana in his bed in early 2017. Laneisha also testified that Lopez was a smoker and he smoked regularly on the balcony of his bedroom; she estimated he smoked two or three cigarettes a night. Laneisha testified that she had never seen Lopez smoke inside his home. Laneisha stated that it was Lopez's practice to put out his cigarettes on the floor of the balcony or on a metal patio table, and that he did not keep an ashtray on the balcony.

Phone records introduced at trial showed that Lopez's cell phone was stationary in the area of the townhome from 7:29 p.m. the evening of the fire until it stopped transmitting. The phone was in use until around 1:00 a.m., and stopped transmitting sometime between that time and 5:30 a.m. Lopez's cell phone was never recovered.

On November 21, 2017, Lopez was interviewed at his attorney's office by police homicide detective Daniel Burow. The interview was recorded and played for the jury in its entirety. Lopez told Burow he was asleep in bed when he awoke to black smoke in his room and felt the heat from the fire. Lopez said he got up and yelled for the children, then went to their rooms and broke out the window in his son's room. Lopez recalled that he wanted to toss Cristos and Isabella outside to safety. Although she had her own room, Isabella sometimes slept in the bottom bunk in Cristos's room, and Cristos slept in the top bunk. Lopez thought both of them were in Cristos's room that night.

Lopez told Burow he saw smoke rushing to the top of the room when he awoke. He got up, screaming for the children, and went to his son's room. When the detective explained that the downstairs window was broken, Lopez said he thought he had broken the window in his son's room. He said he "did [his] hardest to get the hell out of there, and to get them out." Lopez told

7

Burow he was "in a panic" and "halfway conscious" and was not moving as fast as he normally would, possibly from smoke inhalation. He remembered feeling lethargic and disoriented. Lopez told Burow that he believed he had succeeded in getting his children out of the house until he was awake in the hospital and his sister told him the children had died in the fire.

When Burow questioned Lopez about the cause of the fire, Lopez said he did not know how it started. His only guess was a candle in a glass jar on his dresser that he might have lit that night. He thought he would have put the candle out before going to sleep, but said he had "slept hard" that night. Lopez also told the detective he had just been laid off from his job, was late on his mortgage, and had not slept "for days." When Burow questioned Lopez about his smoking habits, Lopez initially said he was not a regular smoker and smoked only when he was stressed and never when his children were home because they both were asthmatic.

Lopez denied smoking the night of the fire, and said when he did smoke it was outside on the balcony and not inside his room. Lopez estimated he typically smoked two cigarettes a day. His practice was to smoke on the balcony at a table and chairs, and he usually smoked at night. He told Burow he smoked American Spirit cigarettes in a blue box and that he used an old drinking glass to collect the ashes and cigarette butts. Lopez denied intentionally setting the fire. He explained that the night of the fire, he had been arguing with Laneisha through text messages.

When Burow told Lopez the candle had been ruled out as the cause, and that the fire started near the bed, Lopez reiterated that he never smoked while his son was there, but that if he had been smoking and did not remember, it would have been outside on the patio. Burow explained to Lopez that electrical causes had also been ruled out and that the fire

8

investigators suspected a cigarette caused the fire. When Burow suggested there were cigarettes in a cup inside the bedroom, Lopez said the cup would have been outside on the balcony.

Burow asked Lopez if it was possible that he did not put his cigarette out outside, but instead dropped it inside after falling asleep since he had been sleep-deprived. The detective also said Lopez's burns suggested the fire started in the bed with Lopez. Lopez said it was possible that he had a cigarette outside, but that he would not have had a cigarette inside and fallen asleep with it in his hand. Lopez believed that if he had smoked that night, it would have been outside. Lopez also said the only way smoking materials would have been in his room was if he was cleaning up the cigarette butts from the balcony and brought the cup with his discarded butts into his room. Lopez admitted he had smoked in his garage once, but otherwise maintained he never smoked inside the home. Lopez told Burow that the smoke and carbon monoxide detector for his bedroom was not working at the time of the fire because its battery had died, and Lopez had yet to replace it.

When Burow again told Lopez that the fire originated around where Lopez was asleep in his bed, Lopez responded, "That would've been probably a—maybe one of the cigarettes that I … If I had smoked that night, maybe the cigarette wasn't all the way out, I don't know, you know?" Lopez repeated that he did not remember smoking the night of the fire and that he would not have smoked if his son was there. When Burow asked if Lopez remembered drinking that night, Lopez was adamant he did not drink. He said he had two beers with dinner the previous night, but did not drink before or after the Halloween carnival.

Lopez told Burow he had his phone with him in bed while he was texting Laneisha. Lopez said he used the 10-foot charging cord Laneisha

gave him to charge his phone at night, and usually slept with his phone under his pillow or occasionally laid it on the floor near his bed. He thought the phone would have been under his pillow that night so he would hear the alarm to get up early to drive to Ontario.

When Burow asked Lopez about his use of marijuana, Lopez said he used it occasionally for insomnia, but that he was not smoking marijuana that night. When the detective asked if it was possible Lopez did not remember things because he had been drinking, Lopez again denied drinking and also denied taking any sleep aids. Lopez said he did not know how the fire started, "but it's not unlikely, again, that I would've cleaned up and then kind of put stuff here, because when it wasn't a lot of butts, I would take it to the toilet and flush them." Lopez then stated "it's not unlikely for me to just put that glass that I had with all those butts in there, and then you know, put it in a bag, and then douse it under the water sink, and just … throw it in the trash." Lopez also admitted it was possible that he put the glass with cigarette butts on the floor by the bed or underneath the bed where the children could not see it, intending to douse the cigarette butts with water and dispose of them in the trash, but he did not remember doing so that night. The last thing he remembered that night was texting Laneisha.

When Burow explained that blood drawn when Lopez arrived at the hospital showed alcohol in his system, Lopez again said he did not remember drinking that night, but it was possible. On repeated questioning by Burow, Lopez maintained that he had no recollection of drinking the night of the fire. He agreed it was possible that if he had a couple of drinks and was smoking, he forgot about his cigarette or put it out in the cup under the bed, igniting the fire, but Lopez had no recollection of this happening.

At the end of the MAST and police investigations, Whitney reached the conclusion that the probable cause of the fire was discarded smoking materials that ignited Lopez's bedding.[2] At trial, in support of this theory, Whitney pointed to the empty packs of American Spirit cigarettes found in the house, the empty plastic bottle of whiskey, the cup of cigarette butts and discarded cigarette materials, and loose cigarette butts that were found in a trashcan in the garage. In particular, Whitney noted the cup and the whiskey bottle in the trash were similar to the fire damaged cup and bottle found in the bedroom. Whitney thought that Lopez's statement that he had a pattern of putting cigarettes into a cup to throw away later also supported his opinion that the fire was caused by smoking, even though there was no evidence of smoking materials in close proximity to the area of origin. Whitney also noted Nikia's statement that she had seen Lopez smoke inside the home on a previous occasion.

Whitney further testified about experiments he conducted after the preliminary hearing, when he learned he had incorrectly assumed that the cigarettes Lopez smoked were unfiltered. To determine if it was possible for cigarette filters to be completely consumed by the fire, Whitney ignited a cigarette with a torch. Whitney observed that the cigarette filter continued to burn even after the flame was removed, leaving just ashes, and concluded a lit cigarette on the bed could have been consumed by the fire with only unidentifiable debris remaining. A second demonstration showed a lit cigarette continued to burn on its own for more than 21 minutes. Video-recordings of the experiments were played for the jury.

---

[2] Whitney did not listen to Lopez's recorded interview. Rather, Burow relayed to Whitney what Lopez told him during the interview.

The prosecution also called the investigator for the homeowners insurance company, Thomas Derby, who examined the home on November 7, 2017, after the MAST and police officials had concluded their investigations of the premises. Like Whitney, Derby concluded based on the pattern of burning that the fire originated at the upper right corner of the bed, with the fire consuming the mattress, box spring, and the side rail in that area. Derby also found no damage to the electrical outlets and related wiring.

Derby testified he saw an ashtray with cigarette butts and cigar butts on a vanity against the wall in front of the bed. He took a photograph of the ashtray but did not have it with him at trial and had not been questioned about it earlier. He saw the discarded beer cans and whiskey bottle downstairs in the kitchen trashcan. He hypothesized the fire resulted from drinking and smoking in bed. He ruled out all other possible causes of the fire.

Finally, the prosecution introduced the testimony of a fire research engineer for the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Jonathan Butta. Butta conducted a series of tests to determine whether common bedding materials ignited when exposed to cigarettes. He concluded "in the right scenario, cotton bedding materials are susceptible to ignition via – via a lit cigarette. So, therefore, it is possible that a lit cigarette could ignite materials consistent with bedding." Butta also testified that 50% of all-cotton bedding materials tested resulted in smoldering combustion, and four percent in flaming combustion. Butta stated that in some scenarios—for example where fans were added, the ventilation was

12

changed, or the bedding material samples were crumpled—the probability of ignition increased significantly.[3]

B. *Defense Case*

Lopez's defense was that the prosecution could not prove beyond a reasonable doubt that the fire was ignited by a cigarette in his bed because it was possible the fire was started by Lopez's cell phone malfunctioning. Lopez called a private fire investigator, Robert Rowe, to testify. Rowe told the jury the experiments Whitney conducted failed to adequately recreate the conditions of the fire at Lopez's home, and that the experiments were not an adequate method of testing whether the cigarette would have been totally consumed in the fire. Rowe also criticized the conclusions reached by Whitney and Derby and suggested smoking should have been ruled out as a possible cause of the fire because no smoking materials were found in the area of origin, and because Lopez had denied smoking in his bedroom.[4]

Rowe further suggested the investigators inadequately explored the plausibility of Lopez's iPhone as a potential cause for the fire. Rowe did not offer an opinion as to the cause of the fire but said that the iPhone was a more likely cause than discarded smoking materials. Rowe did agree that if a phone charging cord caused the fire, it would have been damaged.

---

[3] A ceiling fan partially destroyed in the fire and suppression efforts had hung above Lopez's bed.

[4] Rowe did concede on cross-examination that cigarette filters are not recovered in every instance in which a fire is started by a cigarette.

C. *Verdict and Sentencing*

After trial, the jury convicted Lopez of two counts of felony child abuse (Pen. Code, § 273a, subd. (a)[5]), unlawfully causing a fire resulting in great bodily injury (§ 452, subd. (a)), and two counts of involuntary manslaughter (§ 192, subd. (b)).  As to the child abuse counts, the jury found that Lopez willfully caused or permitted a child to be injured or harmed resulting in death within the meaning of section 12022.95.  The jury also found Lopez caused injury to more than one victim.  (§ 452.1, subd. (a)(3).)  Thereafter, the trial court sentenced Lopez to a determinate term of twelve years eight months in state prison.  Lopez filed a timely notice of appeal.

DISCUSSION

I

*Sufficiency of Causation Evidence*

Lopez first asserts insufficient evidence supports the jury's finding that a cigarette ignited his bedding, causing the fire.  Lopez argues that the expert opinions of Derby and Whitney were "so weak, flawed and unreliable as to not constitute sufficient evidence."  The Attorney General responds that the testimony of Whitney, Derby, and Butta constituted sufficient evidence to support the finding.

A

*Legal Standards*

For the felony child endangerment (§ 273a) convictions, the jury was required to find the prosecution proved beyond a reasonable doubt that (1) Lopez, while having care or custody of the children, willfully caused or permitted the children to be placed in a situation where their person or health was endangered; (2) Lopez caused or permitted the children to suffer

---

[5]     Subsequent undesignated statutory references are to the Penal Code.

14

or be injured or be endangered under circumstances likely to produce great bodily harm or death; and (3) Lopez was criminally negligent when he caused or permitted the children to suffer or be injured or endangered. For the conviction for unlawfully causing a fire resulting in great bodily injury (§ 452, subd. (a)), the jury was required to find Lopez recklessly set fire or burned or caused to be burned any structure, and that the fire caused great bodily injury to another person. Finally, for the involuntary manslaughter (§ 192, subd. (b)) convictions, the jury was required to find Lopez owed a legal duty to his children, he failed to perform that duty, the failure was criminally negligent, and the failure caused the deaths of the children.

In assessing the sufficiency of the evidence supporting a criminal conviction, this court must determine whether any rational jury "could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; accord *People v. Mendoza* (2011) 52 Cal.4th 1056, 1068–1069.) "Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 139.) "When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment." (*Mendoza,* at p. 1069.)

"We neither reweigh the evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638.) "Resolution of conflicts and inconsistences in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid*.)

15

B

*Analysis*

Lopez argues insufficient evidence supported the jury's causation finding because the opinions of the prosecutions' experts were based on falsities. Specifically, he asserts that because Whitney never listened to Lopez's interview with police, Whitney wrongly believed that Lopez told Burow he had a pattern and practice of smoking in his bedroom. Further, Lopez argues that Whitney's opinion that smoking ignited the fire was not supported by sufficient evidence because Whitney was not aware until the preliminary hearing that Lopez often kept his iPhone 6 under his pillow at night and the iPhone was never recovered. Finally, Lopez argues that the experiment Whitney conducted to determine if the cigarette filter would have been consumed in the fire was so flawed that it is entitled to no evidentiary weight.

Similarly, Lopez argues that Derby's testimony was unreliable because Derby was not aware that "there were no cigarettes in the house be they butts, ash tray, or entire cigarettes" or that the cup of cigarette butts that Derby noted in the bedroom had been moved there by investigators prior to Derby's examination of the room. (Italics omitted.) Lopez also argues Derby's opinion was unreliable because he was not aware until trial that Lopez sometimes kept his cell phone under his pillow and it was not recovered after the fire.

Under Evidence Code section 801 an expert may offer any opinion so long as it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and is "[b]ased on matter (including [the expert's] special knowledge, skill, experience, training, and education) perceived by or personally known to the

16

witness … that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert's] testimony relates[.]" (Evid. Code, § 801, subds. (a)–(b).)  Further, an expert's opinion based on assumptions of fact must have evidentiary support.  (*People v. Wright* (2016) 4 Cal.App.5th 537, 546 (*Wright*).)  Thus, an expert's opinion on an issue of ultimate fact, like causation, is admissible and may constitute sufficient evidence to sustain a conviction if it is based on an adequate factual foundation.  (*People v. $47,050* (1993) 17 Cal.App.4th 1319, 1325.)

An expert in fire causation "may identify a causative force by a process of eliminating other causes."  (*People v. Sundlee* (1977) 70 Cal.App.3d 477, 484; see also *George v. Bekins Van & Storage Co.* (1949) 33.Cal.2d 834, 844 [fire investigator's opinion that "fire was caused by careless smoking was reached by a process of elimination of other possible causes."].)  The "strength of [the expert's] assumptions affects the weight rather than the admissibility of his opinion."  (*Sundlee*, at pp. 484–485.)  The weight given the opinion, therefore, is a question for the trier of fact.

1. *Whitney*

Here, Whitney's ultimate opinion that a discarded cigarette caused the deadly fire, and not a malfunction in Lopez's iPhone, was supported by his testimony concerning the facts of his investigation and additional evidence concerning Lopez's smoking and drinking habits.  On direct examination, Whitney explained the basis for his expertise (including almost a decade as a fire investigator and involvement in over a thousand fire investigations with the San Diego Fire Department), the basics of fire dynamics, and the method he used to conduct cause and origin fire investigations.  Whitney then carefully described the methodology he used in this case to determine where the fire originated.  He explained that once at the scene, he began examining

17

the townhouse, taking pictures of the electrical services and smoke and fire damage as he moved closer to the fire's origin, which he ultimately concluded was Lopez's bed.

Based on the location of damage, Whitney determined that the fire had not originated on the balcony outside the bedroom. He described the severity of the damage within the bedroom, particularly near the right hand side of the top of the bed. Whitney explained the fire destroyed the ceiling above the bed, causing a ceiling fan above to fall, and charred the roof rafters above the fan, indicating to Whitney that the fire had raged so hot that the smoke reached the point of flaming.[6] Whitney's photographs, which were introduced into evidence, showed the severity of damage to the bed itself, with the most damage to the upper right corner, including the complete consumption of the mattress, box spring, and wooden bedframe in that location. Whitney testified that he eliminated other potential causes of the fire, explaining that he ruled out the existence of any accelerant that would indicate arson, electrical causes, and a burning candle.

Whitney thoroughly explained the basis for his opinion that the fire was caused by discarded smoking material that ignited highly flammable bedding material.[7] He noted the empty pack of American Spirit cigarettes found in a trashcan in the garage along with an empty plastic bottle of Canadian Mist whiskey and the glass cup filled with cigarette butts, as well as other smoking materials found elsewhere in the townhome. He also

---

[6]    Because of the lack of other damage to the ceiling fan's bulbs and electrical components, Whitney ruled the fan out as the cause of the fire.

[7]    Whitney explained that the type of foam topper on Lopez's bed burns violently and is referred to in the fire services world as "puffy gasoline polyurethane foam" because "once ignited, it produces a lot of energy similar to pools of gasoline[.]"

testified that the cup filled with cigarette butts and the whiskey bottle found in the trash were similar to the fire-damaged bottle and cup found in the bedroom, supporting an inference that Lopez was drinking and smoking in his room or on the balcony the night of the fire. Whitney agreed no cigarette butts were found in the area of origin of the fire, but he concluded it was possible the filter from the cigarette that started the fire would have been completely consumed, as well as any cigarette remnants that might have been in the glass cup. Whitney also relied on Lopez's ex-wife's statement that she had seen Lopez smoke inside the home.

These facts underlying Whitney's opinion were not, as Lopez argues, "speculative, remote or conjectural" such that his opinion carried no evidentiary value. Rather, the inferences Whitney drew to conclude the fire was caused by a discarded cigarette were based on evidence of Lopez's smoking habits, the level of his intoxication that evening, the statement of Lopez's ex-wife that she had previously seen Lopez smoke inside, and Whitney's thorough investigation of the fire damaged townhome. The fact that Lopez presented an alternative theory of causation did not erase the reasoned and supported conclusion drawn by Whitney.

In addition, Whitney was methodically cross-examined by Lopez's defense counsel on his theory of causation and on the possibility that the fire was started by Lopez's iPhone malfunctioning. Unlike Derby, discussed below, Whitney was aware of the disappearance of Lopez's cell phone prior to trial, which he had considered but which did not change his conclusion that the probable cause of the fire was a discarded cigarette.

In addition, defense counsel suggested to Whitney that the investigation was tainted by confirmation or expectation bias, contrary to National Fire Protection Association (NFPA) guidelines, and that the

19

investigators should have requested an outside agency to conduct more rigorous testing and analysis. Whitney rejected the suggestion his conclusion was the product of expectation bias and explained that under NFPA guidelines, "probable" meant that there was a greater than 50 percent probability of causation.

On cross-examination, Whitney also reiterated his position that his conclusion was based on the presence of cigarettes in the house, witness statements that there was a history of smoking in the house, Lopez's admission that he regularly smoked on the balcony outside his bedroom, Whitney's knowledge based on his training and experience that the bed and bedding materials can be ignited by cigarettes, the glass found near the bed that matched the cup in the garage that held discarded cigarette butts, and Lopez's statements that he routinely put cigarettes in a cup and brought them inside off the balcony to discard.

Contrary to Lopez's characterization of Whitney's testimony that he was mistakenly told Lopez had a practice of *smoking in bed*, Whitney stated that detective Burow told him that "the defendant had a past practice and pattern and history of putting cigarettes in a cup next to his bed[.]" This statement was not an exact recounting of one of the various statements Lopez made to Burow, but it was a fair summary of the statements Lopez made during the interview. Lopez said he smoked half of two cigarettes a night on his balcony, and he would pinch the cigarettes out into an old candle holder or a glass then douse the cigarettes with his spit to make sure they were out. Lopez also told the detective that it was normal for him to bring the make-shift ashtray into his room, sometimes flushing the butts down the toilet, so that his son would not find them. Lopez did not want the children to know he smoked and also liked to keep the balcony tidy. Lopez also agreed it was

possible he put the glass cup for cigarette butts under his bed that night (though he was also clear that he had no recollection of doing so). Whitney's inexact summary of Lopez's statement to Burow does not amount to false evidence.

2. *Derby*

Derby's investigation on behalf of the homeowners insurance company took place after both Whitney and the police had investigated the townhome. As Lopez emphasizes in his briefing, Derby found the cup of cigarette butts and liquor bottle in the bedroom, but it had been moved there from elsewhere in the townhome by the earlier investigators who placed it next to the charred cup and similar melted liquor bottle for comparison. This scene, which altered the room as it existed immediately after the fire and suppression efforts, was illustrated by a photograph that Whitney took after the items were moved and that was presented to the jury.

Lopez argues Derby improperly relied on this photograph to conclude Lopez was smoking in his room and therefore caused the fire. We agree with Lopez that if the proximity of the unburned cup of cigarettes and liquor bottle alone was the basis for Derby's ultimate opinion, it would be conjectural and insufficient. However, Derby's testimony shows the basis of his opinion was not this narrow. When asked if he found a source of ignition in the bedroom, Derby stated "I found an ashtray that had cigarette butts and, I believe, cigar butts. [This] indicated to me that there's a possible smoker in that room."

Derby continued "I then went downstairs to the kitchen and started looking in the trash receptacles and found a plastic container for a Canadian whiskey that was empty. I believe there was a couple of beer cans also. So I hypothesized that there's a possibility that the person could have been drinking and smoking at the time of the fire." Derby then stated that "based

21

on the area of origin and the lack of any other causes, I formed an opinion that there's a possibility that the fire could have been caused by smoking material." Finally, Derby stated he ruled out any other cause of the fire, "accidental, electrical, shorting of wiring or appliances."

As with Whitney, Lopez's counsel also drew out the flaws in Derby's investigation in his cross-examination. Derby testified explicitly he was not aware the ashtray cup filled with butts had been moved into the room or that Lopez told the police he had left his phone under his pillow that night. The jury heard for themselves the limited amount of investigation that Derby conducted before reaching his final conclusion and could credit (or discredit) the testimony accordingly.

3. *Additional Evidence*

ATF engineer Jonathan Butta testified he conducted two types of experiments to determine whether a lit or smoldering cigarette could ignite cotton bedding. Based on those experiments, Butta opined that "cotton bedding materials are susceptible to ignition via … a lit cigarette" in 50% of the tests he conducted, and the rate increased to 92% when an overhead fan was in use. As discussed, Nikia testified that she had witnessed Lopez smoking inside the home. Lopez himself admitted to smoking daily on his balcony and the blood tests revealed he was extremely intoxicated during the fire.

C

*Conclusion*

Lopez's argument amounts to a request to reweigh the evidence, a task for which this court lacks authority. (See *People v. Clark* (2016) 63 Cal.4th 522, 625–626 [" 'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation]" [Citation.] "Although it

22

is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' "].) The fact that Derby did not have access to all of the facts surrounding the fire unquestionably limited the value to be placed on his testimony, but it did not make the testimony inadmissible or completely devoid of value. (See *People v. Maury* (2003) 30 Cal.4th 342, 403 ["Conflicts and even testimony which is subject to justifiable suspicion do not justify reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."].)

The jury was made aware Derby did not know about the missing iPhone or how the unburned ashtray filled with cigarette butts got into the bedroom after the fire.[8] Likewise, because they heard Lopez's entire interview with Burow, the jurors could judge for themselves whether Whitney's ultimate opinion on causation was corrupted by Burow's summarization of the interview. Contrary to Lopez's assertions, the limitations of the opinions of the prosecutions' experts were put before the members of the jury. On the other side of the ledger, the evidence supporting the defense theory was relatively weak. The evidence in support of the

---

[8] We note that the photograph of the scene makes clear that the unburned glass, cigarette butts, and liquor bottle were not present during the fire. Unlike every other material in the bedroom in the photograph, the items had no smoke or fire damage on them.

iPhone malfunctioning was limited to Lopez's equivocal statement to Burow that he sometimes kept the phone under his pillow. Lopez, however, was badly discredited in the interview, during which he lied about his consumption of alcohol the night of the fire.

In sum, it was the jury's role to judge the strength of the expert's opinions, not this court's. Whitney's opinion that the fire was caused by discarded smoking materials, in conjunction with all of the evidence underlying that opinion, was sufficient to support the jury's finding that Lopez caused the fire by way of a discarded cigarette and that he was too intoxicated to save his children.[9] (*Wright, supra*, 4 Cal.App.5th at p. 545.)

## II

### *The Prosecution's Expert Testimony Was Not Based on False Evidence*

Recasting his prior argument, Lopez next contends he is entitled to a new trial because the prosecution's case was based on false evidence. He argues that reversal under section 1473, subdivision (b)(1) is appropriate because the prosecution introduced "[f]alse evidence that is substantially material or probative on the issue of guilt" in the form of: (1) Derby's reliance on the fact that the glass cup containing cigarette butts that was found in the trash was placed in the bedroom and (2) Whitney's reliance on Burow's statement to him that Lopez routinely placed an ashtray under his bed. Similarly, Lopez asserts the prosecutor committed prejudicial error by "adducing the false evidence by Derby and Whitney." (Underscoring omitted.)

---

[9] Lopez asserts that because there were two equally viable theories of causation, the jury was required to entertain reasonable doubt and thus his convictions cannot stand. This argument is not well-taken and runs contrary to the standard of review this court is bound to apply. (See *Clark, supra*, 63 Cal.4th at pp. 625–626.)

The Attorney General responds that section 1473, subdivision (b)(1) is not applicable outside the context of habeas corpus and, even if applicable, does not support reversal here because the expert testimony at issue did not constitute false evidence. With respect to the alleged prosecutorial error, the Attorney General argues the issue was forfeited by defense counsel's failure to raise it. Further, he argues the claim also lacks merit because the evidence at issue was immaterial.

We decline the parties' invitation to determine whether the standards set forth in section 1473, subdivision (b)(1) apply in the context of direct appeal because we agree with the Attorney General that no false evidence was presented to the jury in this case. Additionally, the alleged false evidence was not material.

" ' "Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents[.]" ' " (*People v. Charles* (2015) 61 Cal.4th 308, 328.) Here, the inaccuracy in what detective Burow told Whitney about Lopez's smoking habits was nullified by the prosecutor playing the entirety of Burow's interview of Lopez for the jury. To the extent that Whitney was inaccurate or mistaken in his testimony about Lopez's habits with respect to disposing of his balcony ashtray, the jurors heard for themselves what Lopez actually told Burow.

Further, Whitney's testimony was clear that he relied on what Burow told him about his interview with Lopez, and that he had not been provided with the recording or a transcript of the interview. As discussed, any inconsistency in what Whitney recalled did not amount to false evidence, especially where Whitney was thoroughly cross-examined about the shortcomings in his testimony on direct examination and where the jurors

could evaluate for themselves whether Lopez's statements supported Whitney's opinion. (See *People v. Vines* (2011) 51 Cal.4th 830, 874 ["Mere inconsistencies between a witness's testimony and her prior statements do not prove the falsity of the testimony."].)

Likewise, with respect to Derby's testimony about the location of the unburned glass filled with cigarette butts, Derby's testimony showed only that he was unsure of where the glass came from. When asked by the prosecutor if he saw any sources of ignition when he first examined the bedroom, Derby responded he "didn't see anything in particular because of the fact that the room had been overhauled prior to [his] examination." When next asked if he found "any sources of ignition within the room," Derby responded that he found "within the room … an ashtray" with cigarette butts inside that indicated to him "that there is a possible smoker in that room." Neither this question, nor Derby's answer, however, showed that Derby understood the cup to be in the room *at the time of* the fire. Rather, the photographs of the cup, which showed it was untouched by smoke or fire, suggested it was not. Lopez's counsel cross-examined Derby extensively on this point resulting in Derby stating he agreed that no ashtray or cigarette butts were recovered from the bedroom during the MAST and police investigations. This testimony was not false evidence.

For the same reasons, the alleged false evidence was also not material as required for a successful petition for habeas corpus under section 1473, subdivision (b)(1). "Section 1473, subdivision (b)(1) provides that a writ of habeas corpus may be prosecuted if '[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration ….' False evidence is 'substantially material or probative' (*ibid.*) 'if there is a

26

"reasonable probability" that, had it not been introduced, the result would have been different.  [Citation.]' " (*In re Roberts* (2003) 29 Cal.4th 726, 741–742.)

Both Whitney and Derby were thoroughly cross-examined about the bases for their opinions and, as discussed, the jury heard Lopez's full interview by Detective Burow.  Any misleading effect of Derby's statements about the location of the unburned glass filled with cigarette butts at the time of the fire was corrected by the testimony of the crime scene investigator who took the stand immediately after Derby.  The investigator stated explicitly that no ashtray or other cigarettes were found in Lopez's room during his investigation.  This fact was also repeatedly emphasized by Lopez's counsel.

In addition, the jury was explicitly instructed to consider the opinions of the experts, but that they were "not required to accept them as true or correct."  The instruction, based on CALCRIM No. 332, stated "[t]he meaning and importance of any opinion are for you [the jury] to decide" and "[i]n evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the

evidence."  The jury was also instructed on evaluating conflicting evidence.[10] Given these facts, we hold there is no "reasonable probability" the result would have been different without the "false evidence" alleged by Lopez on appeal.  (*In re Figueroa* (2018) 4 Cal.5th 576, 589.)

III

*Admissibility of Whitney's Experiment*

Lopez next asserts the court abused its discretion by admitting the video and related testimony of the experiment Whitney conducted prior to trial to show that a cigarette filter could have been consumed by the fire. More specifically, Lopez argues there was insufficient foundation provided to admit the evidence and the experiment was not scientific or sufficiently similar to the conditions of the actual fire.  The Attorney General responds that there was no abuse of discretion, and any alleged error was harmless.

A

*Additional Background*

Before trial, the prosecution moved to admit a video recording of Whitney's experiments.  Lopez's counsel objected to the evidence, asserting it was not scientific and instead an improper attempt by Whitney to rehabilitate himself after testifying at the preliminary hearing that the cigarettes that started the fire were not filtered.  The court conducted a pretrial hearing to determine the admissibility of the evidence.  At the hearing, Whitney testified about his extensive fire investigation experience and the experiments he conducted after the preliminary hearing.  Whitney

---

10    The instruction, patterned on CALCRIM No. 318, stated:  "You have heard evidence of statements that witnesses made before the trial.  If you decide that the witnesses made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; [¶] AND [¶] 2. As evidence that the information in those earlier statements were true."

explained that he lit an American Spirit cigarette to see if it would continue to burn to the filter if unattended. Whitney also applied an open flame to the cigarettes, from a propane plumber's torch and a barbecue lighter, to determine if the filter would be consumed if exposed to flame. Whitney stated the heat intensity or heat energy applied in the experiment to the cigarette would be less than if the cigarette were on a burning bed.

At the conclusion of the hearing, over the defense's objection, the court ruled videos of the experiments were admissible. The court noted that the defense's criticisms were properly addressed to the weight of the evidence, not its admissibility. The court further stated that the conditions of the experiment were substantially similar to those of the fire, and that the evidence would assist the trier of fact and not mislead them or consume undue time. During the prosecutor's direct examination of Whitney, the video of the torch burning the cigarette filter was played for the jury.

B

*Legal Standards*

" ' "Under Evidence Code section 352, the trial court has wide discretion to admit or reject experimental evidence. We reverse decisions to admit or exclude such evidence only when the trial court has clearly abused its discretion." ' (*People v. Jones* (2011) 51 Cal.4th 346, 375–376.) Before experimental evidence may be admitted, the proponent must establish that the experiment is relevant, was ' " 'conducted under substantially similar conditions as those of the actual occurrence,' " ' and will not mislead or confuse the jury or take undue time." (*People v. Peterson* (2020) 10 Cal.5th 409, 460.) "The party need not, however, show that the conditions were absolutely identical." (*Jones,* at p. 375.)

With respect to the sufficiency of the foundation of the evidence, under "Evidence Code section 403, subdivision (a) … '[t]he proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when … [t]he relevance of the proffered evidence depends on the existence of the preliminary fact[.]' " (*People v. Marshall* (1996) 13 Cal.4th 799, 832.) "In other words, the trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence [citation], even if the court personally would disagree [citation]." (*Id.* at pp. 832–833.) We will not disturb the trial court's evidentiary ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

# C

## *Analysis*

We do not agree with Lopez that the court's decision to allow the video recordings of Whitney's experiments to be shown to the jury was an abuse of its discretion. The videos showing the filter of the cigarette being consumed by the flame of the propane torch and lighter were relevant to show that there would not be physical remnants of the filter of the cigarette that started the fire. The conditions were obviously not identical to the fire, but were substantially similar to the conditions the cigarette would have been subjected to during the event. Lopez criticizes the experiments because during trial Whitney could not recall the temperature of the flames from the torch and lighter, or how those temperatures would compare to the fire.[11]

Whitney explained, however, that it was not the temperature that mattered most in determining what level of destruction occurred but rather the amount of energy being released by the fire as it burns through the fuel source. Whitney stated that the fuel of the bedding and mattress would produce a greater amount of energy, or heat flux, than the torch or lighter, even though the temperature of the orange flames that might exist was lower than the blue flames of the torch.[12]

To support his argument that the experiments performed by Whitney should not have been admitted into evidence, Lopez relies primarily on two cases, *People v. Coleman* (1988) 46 Cal.3d 749 (*Coleman*) and *People v.*

---

[11] Whitney conceded that a blue flame's temperature could measure 3600 degrees Fahrenheit, while an orange or yellow flame would measure 1800 degrees.

[12] Lopez's expert, Rowe, also conceded that filters or other remnants of cigarettes were not always found in fires started by cigarettes.

*Skinner* (1954) 123 Cal.App.2d 741 (*Skinner*).  Neither case shows the trial court here abused its discretion.  In *Coleman*, an automatic appeal from a death sentence imposed after a first-degree murder conviction, the defendant challenged the admission of "hemostick" evidence.  The device detects the presence of blood and was used by a crime scene investigator to determine if there was blood at the scene of the murder.  (*Coleman,* at p. 774.)

The investigator testified about his use of the device, and the defendant challenged the testimony, asserting the prosecutor had failed to establish the device was reliable.  (*Coleman, supra*, 46 Cal.3d at p. 774.)  The Supreme Court agreed the prosecution had failed to provide a proper foundation for the evidence because the investigator "was not an expert on blood or blood tests, nor did he otherwise have a scientific basis on which to testify as to the reliability of the test."  (*Id*. at p. 775.)  Indeed, the investigator indicated he did not know how the device worked.  (*Id*. at p. 774.)  Further, "[n]o alternative or supplemental basis for admission of the test was presented, such as prior appellate court decisions allowing use of such a test or extensive scientific literature supporting the test."  (*Id*. at p. 775.)

In contrast, Whitney was a highly qualified fire investigator and explained in detail the basis for his experiments.  He described how the conditions that would be expected in the bedroom fire compared to and differed from his application of a direct flame to the cigarette filter.  And Whitney was thoroughly cross-examined about the experiment, giving the members of the jury the ability to judge the results of the relatively simple experiment for themselves.

*Skinner* also does not support Lopez's position.  The issue before the Court of Appeal there was the trial court's denial of a request for the defense expert in an arson case to perform several experiments in the presence of the

jury. (*Skinner, supra*, 123 Cal.App.2d at pp. 750–752.) The experiments were meant to recreate the conditions of the fire in an apartment house that killed eight people to show the defendant's confession to intentionally setting the fire was not reliable. The trial court found the conditions of the experiments—which included lighting curtains on fire to demonstrate that they would smolder and not "go poof" as the defendant confessed and dropping a sealed glass mayonnaise jar filled with water to replicate a jar of paint thinner involved in the fire's ignition—were not sufficiently similar to those of the actual fire. The trial court found that conducting the experiments in front of the jury "would have unduly emphasized the inconsistencies of the appellant's story without first establishing similar conditions." (*Id.* at p. 752.) The court, however, did permit the expert to testify about the experiments. The Court of Appeal held this decision was not outside the bounds of the court's discretion, which had "a wide range within which to swing[.]" (*Ibid.*)

Like *Skinner*, the court's decision here permitting the jury to view the video of the experiment, and hear Whitney's related testimony, was not without logic and fell within the court's wide discretion.

33

# IV

## *Instructional Error*

Lopez next asserts the trial court erred by refusing Lopez's requested adverse inference jury instruction concerning the alleged flaws in the prosecution's expert testimony. The Attorney General responds there was no error because the rejected instruction was both argumentative and duplicative of other instructions.

## A

### *Additional Background*

At trial, the defense requested a proposed instruction stating:

The defense has presented evidence that the prosecution's investigation of this case has been negligent, or purposefully distorted, or not done in good faith. For example there has been testimony about the investigators being told about a missing cell phone that had been charging under the pillow specifically where the origin of the fire occurred. The Fire Investigator Wayne Whitney reached his conclusion about discarded smoking materials prior to knowing that a cell phone had been charging there (testifying to that effect at the preliminary hearing and during the jury trial), although this information had purportedly been provided to him by the investigator taking Mr. Lopez['s] statement. With respect to any items of evidence or statements by the investigator as to the finding of the investigation, the probative value of that evidence depends on the circumstances in which it was [or was not] obtained [tested or not tested].

If the circumstances raise a reasonable belief of bad faith, fraud or negligence, you may consider that in determining the credibility of the witnesses and the weight, if any, that you chose to give that evidence.

Remember, under the instructions I have given you, if the evidence permits two reasonable interpretations, you must adopt that interpretation that favors the defendant.

34

During the jury instruction conference, Lopez's counsel argued the instruction was necessary because of the deficiencies in the fire investigation. In response, the trial court asked if the same concepts were contained in the proposed instructions modeled on CALCRIM Nos. 225 and 226. The court also asked Lopez's counsel to provide authority for the instruction and indicated it seemed more appropriate as part of a closing argument, not a jury instruction. Lopez's counsel did not provide any authority, instead arguing the instruction was proper because of the flawed nature of Whitney's testimony and his expectation bias that the fire was caused by a discarded cigarette.

The prosecutor argued there was no legal basis for the instruction and that the issues were adequately represented by three other proposed instructions modeled on CALCRIM Nos. 222, 225, and 226. Defense counsel responded that the proposed instruction was necessary to sanction the prosecution for "having had an investigation that was botched as badly as this" and to challenge the credibility of the investigation generally. The court rejected the defense position. The court stated the defense was free to challenge the credibility of the investigation to the jury, but found that the legal points in the proposed instruction were adequately covered by other instructions.

## B

### *Legal Standards*

"A trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' " (*People v. Moye* (2009) 47 Cal.4th 537, 554.) In addition, a "criminal defendant is entitled, on request, to an instruction 'pinpointing' the theory of his defense. (*People v.*

*Wright* (1988) 45 Cal.3d 1126, 1137; *People v. Sears* (1970) 2 Cal.3d 180, 190.)" (*People v. Wharton* (1991) 53 Cal.3d 522, 570.) "[H]owever, instructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative [citation], and the effect of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.' " (*Ibid.*)

We review a claim of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "In reviewing any claim of instructional error, we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) "There is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial. As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error. The failure to give an instruction on an essential issue, or the giving of erroneous instructions, may be cured if the essential material is covered by other correct instructions properly given." (*Id.* at p. 277.)

C

*Analysis*

As the Attorney General points out, Lopez relies on decisional law that supports the use of an adverse inference jury instruction as a sanction where the government has destroyed or failed to produce evidence. (See, e.g., *Kyles v. Whitely* (1995) 514 U.S. 419, 446, fn. 15 [granting a new trial on a petition for habeas corpus where material evidence was suppressed by the prosecution, and noting generally that the "probative force of evidence

depends on the circumstances in which it was obtained" and "indications of conscientious police work will enhance probative force and slovenly work will diminish it."]; *United States v. Sager* (9th Cir. 2000) 227 F.3d 1138, 1145 [error for judge to instruct "the jury not to 'grade' the investigation" conducted by the postal investigators in a mail theft case]; *United States v. Sivilla* (9th Cir. 2013) 714 F.3d 1168, 1173 [reversing conviction where prosecution negligently destroyed exculpatory evidence and court failed to give a remedial jury instruction]; *People v. Wimberly* (1992) 5 Cal.App.4th 773, 791–792 [concerning destruction of evidence]; *People v. Sassounian* (1986) 182 Cal.App.3d 361, 395 [same]; *People v. Zamora* (1980) 28 Cal.3d 88, 96 [intentional suppression of material evidence].) These cases do not provide a basis for the instruction at issue here because there is no indication the prosecution or investigators withheld or destroyed evidence.

As discussed in the preceding sections, the thoroughness of Whitney's and Derby's investigations was explored extensively on cross-examination and the asserted flaws in their theories were set forth clearly for the jury. Unlike the cases cited by Lopez, material facts were not withheld from the finder of fact and the record does not support the instruction's assertion that "the prosecution's investigation of this case [was] negligent, or purposefully distorted, or not done in good faith." This aspect of the proposed instruction was argumentative and invasive of the jury's role to evaluate the evidence and determine the value of the experts' opinions. (See *People v. Roberts* (1992) 2 Cal.4th 271, 314 [" 'instructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative [citation], and the effect of certain facts on identified theories "is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate" ' "].)

37

Further, the proposed instruction was duplicative of CALCRIM No. 226, the standard instruction addressing witness credibility, and CALCRIM No. 224, which like Lopez's proposed instruction, told the jury: "If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." Additionally, and significantly, the jury was specifically advised on how to evaluate expert testimony. CALCRIM No. 332 instructed the jury: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, *the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.*" (Italics added.) These instructions adequately told the jury how to evaluate the testimony of Whitney and Derby. Therefore, Lopez's proposed instruction was duplicative and the trial court properly rejected it.

V

*Denial of Additional Questioning About Alleged Juror Misconduct*

Lopez asserts that the court erred by refusing his request to pose additional questions to an excused juror who alleged misconduct by other jurors. The Attorney General responds the court did not abuse its discretion

38

by denying the requested hearing because it appropriately determined the juror declaration that formed the basis for Lopez's request was not credible.

## A

### *Additional Background*

After the verdicts were reached, Lopez filed a motion for new trial based, in part, on allegations of juror misconduct that were contained in a declaration by a juror who was excused during deliberations (former Juror No. 4) and defense counsel's interview of the same juror. The prosecution opposed the motion, asserting the evidence on which the motion was based was inadmissible and, even if properly admitted, did not establish misconduct or prejudice.

At the hearing on the motion, former Juror No. 4 was present and available to testify. Defense counsel argued a new trial was warranted based on statements in Juror No. 4's declaration (1) that another juror had failed to disclose that she was or had been employed by a fire department and (2) that other jurors had written notes to the judge during deliberations, but had signed them from former Juror No. 4. The prosecutor responded there was no misconduct with respect to the juror who was employed by a fire department because she had not been asked about her employment in voir dire and there was no allegation that she had withheld any information. With respect to the allegedly forged jury notes, the prosecutor asserted the issue was moot because Juror No. 4 had been excused by the parties' stipulation and was not part of the jury that rendered the verdict, and there was no actual misconduct alleged with respect to the notes.

The court, as an initial matter, determined it would not take additional testimony from the excused juror because there was no dispute that she would testify in accordance with her declaration. The court then found the

declaration was not credible based on the court's prior evaluation of the allegations that the juror had made during trial and that were repeated in the declaration. The court also found the declaration was otherwise not credible, in particular since it asserted "issues" with eight of the eleven other jurors. The court denied the motion both on credibility grounds, and its agreement with the prosecutor's analysis that there was no misconduct alleged in the declaration.

## B

### *Legal Standards & Analysis*

Lopez does not directly challenge the court's denial of his motion for a new trial. Rather, he argues the trial court's denial of his request for additional questioning of former Juror No. 4 was a prejudicial error. Lopez asserts that because there were no conflicting declarations, he made a sufficient showing to obtain an evidentiary hearing, and the trial court's "sweeping pronouncement that the juror was not credible" was not supported by the record. These claims lack merit.

"The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Citation.] Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that

40

can only be resolved at such a hearing.' " (*People v. Avila* (2006) 38 Cal.4th 491, 604.)

" 'The power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court….' [Citation.] 'It is an established principle that the credibility of witnesses and the weight to be given their testimony are matters within the *sole* province of the trier of fact….' [Citation.] 'A trier of fact may accept such witnesses as he wishes and reject others.' [Citation.] 'Where there is conflicting testimony, reviewing courts recognize that the trier of the facts has the better opportunity to judge the credibility of witnesses.  In such a case the trial court's findings of fact, to the extent that they rest upon an evaluation of credibility, should be regarded as *conclusive* on appeal.' [Citation.] '[S]o long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citations.]  Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' " (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463–1464.)

The trial court's determination that former Juror No. 4 was not credible, and no further evidentiary hearing was warranted, was far from arbitrary.  The record shows that during deliberations the excused juror submitted notes alleging misconduct by other jurors.  The court inquired into each of the excused juror's allegations, directly questioning the other jurors, and found no misconduct.  Later during deliberations, the court received a note alleging Juror No. 4 would not follow the law or the court's instructions. Thereafter, defense counsel and the prosecutor stipulated to the dismissal of

Juror No. 4.  Both attorneys stated they wanted her replaced; in fact, defense counsel stated "the court actually has a duty at this point and time ... to remove this juror and replace her with an alternate."13  These prior interactions provided ample evidence in support of the court's credibility determination.  It is not our role to second guess this finding.  The court's decision not to allow questioning of former Juror No. 4 was not an abuse of discretion.  (See, e.g., *People v. McNally* (2015) 236 Cal.App.4th 1419, 1430–1431 [court's denial of request for juror's identifying information to investigate alleged juror misconduct based on the statements of a "disgruntled ex-juror who violated the court's instructions" was not error].)

VI

*Nikia's Testimony That She Had a Double Mastectomy*

Lopez contends that because the crimes involved the death of his two innocent children, the testimony of his ex-wife concerning his escalating drinking during their marriage after she was diagnosed with breast cancer was unduly prejudicial.  Specifically, he objects to the admission of Nikia's statement that Lopez told her "he just couldn't handle it.  'You know, one day I come home and my wife has breasts, and the next day she doesn't,' because I had chose[n] to have a double mastectomy instead of taking the four tumors out."

"The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence.  [Citation.]  'The exercise of discretion is not grounds for reversal unless " 'the court exercised its discretion in an arbitrary, capricious or

---

13    The court replaced the juror and instructed the newly constituted jury to begin deliberations anew.

patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Clark, supra*, 63 Cal.4th at p. 572.)

" ' "The 'prejudice' referred to in … section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' … [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

The statement at issue was made after the prosecutor asked Nikia about Lopez's increased drinking. She told the jury that Lopez's drinking had gotten out of control after she had suffered a series of six miscarriages. In response to the prosecutor's next question, "Can you tell me more about that, it escalating from that point," Nikia gave the response that Lopez now challenges—that Lopez told her "one day I come home and my wife has breasts, and the next day she doesn't." After the statement, the court overruled defense counsel's objection and motion to strike the statement on the grounds it was unduly prejudicial.

The court did not abuse its discretion by denying the motion to strike. Nikia had already testified that Lopez had a habit of heavy drinking, and that he had difficulty dealing with the miscarriages and Nikia's subsequent diagnosis of breast cancer, and that his drinking intensified after. The evidence was relevant to show Lopez's history of drinking in response to stress. In particular, the prosecution's case was built on the fact that Lopez had drunk to the point of severe intoxication the night of the fire because of

the stress in his life at the time, including the fight with Laneisha immediately preceding the fire, his recent layoff, and days of insomnia as a result.  The court's decision to deny the motion to strike was well within its discretion.

## VII

### *Cumulative Error*

Finally, Lopez contends that the cumulative effect of the alleged errors deprived him of his federal due process right to a fair trial.  "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' "  (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' "  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)  Finding no errors, Lopez's claim of cumulative error also fails.

## DISPOSITION

The judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:


GUERRERO, J.


DO, J.