Filed 10/24/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOHN WRIGHT,<br><br>　　Defendant and Appellant. | B269705<br><br>(Los Angeles County<br>Super. Ct. No. ZM011387) |


　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Reversed.

　　　　Gerald L. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and John Yang, Deputy Attorney General, for Plaintiff and Respondent.

　　　　　　　　　　————————————

In January 2016, the trial court, pursuant to the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.[1]), found John Wright (Wright) to be a sexually violent predator (SVP) and committed him to a state hospital for an indefinite term.

On appeal, Wright advances a number of different arguments, including that the commitment order was not supported by substantial evidence. In particular, Wright argues that the diagnosis of hebephilia by the People's expert was fundamentally flawed due, inter alia, to a lack of information about the physical characteristics and/or sexual development of the victims. We agree with Wright. With regard to the diagnosed mental disorder offered by the People, " 'there is simply too great an analytical gap between the data and the opinion proffered.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771 (*Sargon*).) Accordingly, we reverse the judgment.

## BACKGROUND

### I. Wright's prior convictions

In 1996, Wright sustained a conviction for committing a lewd act upon a 14-year-old female in 1995, a conviction which resulted in a six-month jail term and probation. At the time of the offense, Wright was 26 years old. The victim reported being forcibly abducted and pulled into a car by Wright, who took her to an apartment and fondled and kissed her before she could escape. Initially, the People charged Wright with kidnapping, as well as

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

committing a lewd act, but subsequently dropped the kidnapping charge as a part of a plea agreement.

In 2001, at age 30, Wright suffered convictions for committing lewd acts on two underage females, a 14 year old and a 15 year old in 1999.  Wright met the 14-year-old victim on a bus, telling her that he was 18 years old and a college student.  Although a sexual relationship eventually developed between Wright and the 15-year-old victim, the victim reported to the police that Wright was "overly aggressive" with her, that she was afraid she would be sexually assaulted or raped.  With regard to the 14-year-old victim, Wright entered into a sexual relationship with the girl over a period of weeks that eventually led to intercourse.

In 2005, at the age of 36, Wright suffered another sex offense conviction, this time for oral copulation with a female under the age of 18.  Wright approached the victim at a gas station, and quickly cultivated a social and then a sexual relationship with the victim.  Eventually, the victim's father confronted Wright because the victim had loaned Wright money, and had learned that Wright was not his stated age and that he had a history of sexual offenses.

## II.    The trial

Following the 2005 conviction, the People filed a petition to commit Wright to Coalinga State Hospital for an indefinite term under the SVPA.  Two probable cause hearings were held—one in June 2007, the other in February 2012—in which the respective courts found that there was probable cause to proceed to trial under the SVPA and hold Wright in a secured facility pending trial.

On May 27, 2015, Wright waived his right to a jury trial. On January 11-12, 2016, the trial court conducted a bench trial. Only two witnesses testified, both experts, both psychologists: for the People, Dr. Michael Musacco (Dr. Musacco); and for Wright, Dr. Amy Phoenix (Dr. Phoenix).

### A. DR. MUSACCO'S TESTIMONY

Based, inter alia, on his interviews and evaluations of Wright (February 2007, May 2011, and November/December 2015), Dr. Musacco diagnosed Wright with "paraphilia not otherwise specified, hebephilia." Dr. Musacco explained, "Hebephilia is designated as a sexual arousal pattern, deviant pattern, that involves sexual interest in pubescent-age children. It would not be pre-pubescent, not post-pubescent. It's in that in-between area from pre-pubescent to post-pubescent."

In making his diagnosis, Dr. Musacco made a number of concessions. First, hebephilia is a "rare" diagnosis. Second, it is a somewhat controversial diagnosis. So controversial, in fact, that it was deliberately excluded from the fifth and newest edition of the Diagnostic and Statistical Manual of Mental Disorders (published in 2013) (DSM-5), a manual published by the American Psychiatric Association to "identify criteria for the classification of mental disorders." (*People v. Johnson* (2015) 235 Cal.App.4th 80, 83.)[2]

_____

[2] Although neither party addressed this issue below, other states that, like California, follow some form of the "general acceptance" test of *Frye v. United States* (1923) 293 F. 1013, 1014 (see *People v. Kelly* (1976 17 Cal.3d 24, 30–31; *People v. Leahy* (1994) 8 Cal.4th 587, 604; *Sargon, supra*, 55 Cal.4th at p. 772) have found that the exclusion of hebephilia from the DSM-5 means that a diagnosis of hebephilia is "not generally accepted in

the relevant scientific community under the *Frye* standard." (*State of New York v. Ralph P.* (N.Y.Sup.Ct., Aug. 9, 2016) ___ N.Y.S.3d ___, 2016 WL 4224189.) Other *Frye* jurisdictions have held that, as a result of hebephilia's exclusion from the DSM-5, a *Frye* hearing must be held to determine if the diagnosis is generally accepted within the relevant scientific community. (See *People v. New* (Ill. 2014) 21 N.E.3d 406, 417.) Courts in other *Frye* jurisdictions, however, have held that even though hebephilia was not listed in the DSM-5 or the prior edition, a trial court may still conclude based on the facts of the case and expert testimony, that a hebephilia diagnosis satisfies the mental abnormality requirement for purposes of a SVP determination. (*Commonwealth v. Hollingshead* (Pa.Super. 2015) 111 A.3d 186, 189.)

The controversy over hebephilia as a diagnosis upon which to base an involuntary commitment is not new. Even before hebephilia was expressly considered and then excluded from the DSM-5, courts refused to commit individuals as sexually violent persons upon the basis of a hebephilia diagnosis. For example, in *U.S. Neuhauser* (E.D.N.C. Jan. 20, 2012, No 5:07-HC-2101-BO) 2012 WL 174363, the district court found as follows: "Given that even the government's experts concede that characterization of hebephilia is a hotly contested issue in the mental health community, the Court finds that it would be inappropriate to predicate civil commitment on a diagnosis that a large number of clinical psychologists believe is not a diagnosis at all, at least for forensic purposes. Therefore, the Court finds that the government has failed to meet its burden to show that Mr. Neuhauser currently suffers from a serious mental illness, abnormality, or disorder." (*Id.* at *2.)

Under current California law, a SVP's mental disorder need not be listed in the DSM for purposes of commitment, because "[t]he SVPA does not refer to the DSM, much less require an SVP's mental disorder be listed in it." (*People v. Johnson, supra*, 235 Cal.App.4th at p. 91.)

Third, the diagnosis is dependent on knowing more than the victim's age—because children mature physically and develop sexually at different ages, it is important to a know a victim's appearance for that is what is driving the defendant's behavior. In other words, based purely on age, a 15-year-old victim could easily but inaccurately be characterized as postpubescent; similarly a 14-year-old victim who has matured more rapidly than his or her peers could, for purposes of diagnosis, be properly categorized as postpubescent. On a related note, Dr. Musacco admitted that girls begin maturing and finish maturing before boys.

Fourth, and perhaps most critically, Dr. Musacco conceded that he did not know anything about Wright's victims other than their ages at the times of the offenses. As a result, Dr. Musacco had to "hypothesiz[e] that [Wright's] behavior" with regard to the first three victims was driven by their presumed "lack of full sexual development."

Because of this lack of information, Dr. Musacco stated plainly that it is "debatable" whether the hebephilia diagnosis applies to Wright. As Dr. Musacco explained, "I don't . . . know that his behaviors were driven by the sexual development of the victims. I don't know what they looked like. I don't know where they were at [in terms of their sexual development]. I know several were 14. One was 15. One was 17. The 17-year-old, I already said doesn't apply. The 14- and 15-year-old, . . . I can't be certain that's what is driving his behavior. . . . [T]his is not as clear-cut as many of the cases that I have testified on." Because he did not have descriptions of the victims' "body types" or any information about the victims' "development of any sexual characteristics," Dr. Musacco had to make "assumptions that

6

their physical development [wa]s such that [it] meets with the definition of hebephilia." Dr. Musacco acknowledged that certain risks accompanied his assumptions: "[I]f the 15-year-old wasn't pubescent, if the 14-year-olds weren't pubescent, the diagnosis would be inaccurate." As Dr. Musacco explained, "if I knew their body type I could be firm in my opinion or I would retract my opinion."

Finally, Dr. Musacco conceded that Wright's behavior since being admitted to Coalinga State Hospital has been "very good," exhibiting both sexual and general "self-regulation," "no sexual acting out whatsoever."

As a result of these concessions, Dr. Musacco repeatedly characterized his diagnosis as a "close call" or a "close case." On a scale of 1-10, with one being a weak case and 10 being a strong case, Dr. Musacco rated Wright's case as a "six."

After the People rested, Wright moved, pursuant to Penal Code section 1118, to dismiss the petition on the grounds that the People had failed to meet their burden of proof with regard to the existence of a diagnosed mental disorder. The court denied the motion, ruling that the People's evidence was "barely" sufficient to survive Wright's motion to dismiss.

B.    DR. PHOENIX'S TESTIMONY

Like Dr. Musacco, Dr. Phoenix evaluated Wright on several occasions (October/November 2008, December 2010, and October 2015). However, unlike Dr. Musacco, Dr. Phoenix concluded that Wright was not a SVP and "did not have a diagnosed mental disorder, according to the law." Dr. Phoenix did not offer a

psychological diagnosis because she did not think "there is sufficient evidence to support a sexual abnormality of any type."[3]

While Dr. Phoenix was familiar with Dr. Musacco's diagnosis, and with the concept of hebephilia, she was troubled by the lack of evidence demonstrating that Wright was aroused to females in the middle of pubescence (generally, girls aged 11 through 13 and sometimes 14), which is the stage generally associated with hebephilia. Dr. Phoenix believed it was impossible to determine whether Wright's victims were at that stage, because the only data consisted of their respective ages, and there was no information regarding their "sexual characteristics" or "sexual maturity." Of particular significance to Dr. Phoenix was the fact that Wright did not commit any offenses against females between the ages of 11 and 13: "there is no indication he was ever looking for a 10- or 11- or 12- or 13-year-old female who is going to look more immature. And I think we all know there are some 14- 15- 16-year-olds that are quite developed and look older than they are."

In order to make a diagnosis of hebephilia, Dr. Phoenix believed that she would have to make a "broad assumption" that the victims of the 1995 and 1999 offenses were in the middle of their pubescence, when there was no such confirming

---

[3] Unlike Dr. Musacco, Dr. Phoenix did not believe that Wright kept repeating his criminal behavior because it had a deviant objective. Instead, she thought that it was "far more likely" that Wright's conduct was driven by immaturity and egocentrism, by "wanting to be a player, wanting to look like I can get all these girls and have sex and disregard the laws . . . . And not having any kind of moral compass at that time."

information: "I think in this case there is just insufficient information to make that kind of assumption."

Dr. Phoenix declined to make any generalizations or assumptions about Wright's alleged preference for pubescent females for reasons other than the lack of information about the victims. While pertinent information on the victims was absent, there was information about Wright himself which pointed away from a hebephilia diagnosis. For example, Wright had a significant history of relationships with and sexual arousal by adult females, including living with an adult woman for nine years.

C.   *THE TRIAL COURT'S FINDING*

On January 15, 2016, the trial court found Wright to be a SVP and committed him to Coalinga State Hospital for an indefinite term. Although the trial court acknowledged that hebephilia was a "rare" diagnosis, it found that such a diagnosis was warranted in this case for the following reasons: Wright's "similar conduct" with respect to all four victims; the fact that two of Wright's victims were at the time of the offenses between the ages of 11 and 14 (i.e., the ages that "fit" the "definition of hebephilia"); and Wright's "consistent pattern" of targeting young females as soon as being released from jail. The trial court acknowledged but did not address the significance of the lack of evidence regarding the victims' physical/sexual development.

## DISCUSSION

### I.   **The People's burden and the standard of review**

"Section 6604, which describes the determination to be made at trial, requires that a court or jury find 'beyond a reasonable doubt, the person is a sexually violent predator.' . . . A sexually violent predator is defined in section 6600,

subdivision (a)(1), as 'a person who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 246, italics omitted.)

"In reviewing the evidence sufficient to support a commitment under section 6600, 'courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction.' [Citation.] 'Thus, this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be " 'of ponderable legal significance . . . reasonable in nature, credible and of solid value.' " ' " (*People v. Carlin* ((2007) 150 Cal.App.4th 322, 333.)

## II. Expert opinions and substantial evidence

"Although it is true that the testimony of a single witness, including the testimony of an expert, may be sufficient to constitute substantial evidence [citation], when an expert bases his or her conclusion on factors that are 'speculative, remote or conjectural,' or on 'assumptions . . . not supported by the record,' the expert's opinion 'cannot rise to the dignity of substantial evidence' and a judgment based solely on that opinion 'must be reversed for lack of substantial evidence.' " (*Wise v. DLA Piper LLP* (US) (2013) 220 Cal.App.4th 1180, 1191–1192 (*Wise*).)

California has long recognized that an expert's opinion cannot rest on his or her qualifications alone: "even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise.

10

[Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) California courts have been particularly chary of expert testimony based on assumptions that are not supported by the evidentiary record: "an expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities." (*Ibid.*, italics omitted.)

Our Supreme Court recently re-affirmed that " '[a]n expert opinion has no value if its basis is unsound. [Citations.] Matter that provides a reasonable basis for one opinion does not necessarily provide a reasonable basis for another opinion. Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on "in forming an opinion upon the subject to which his testimony relates." . . . We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' " (*Sargon, supra*, 55 Cal.4th at p. 770, italics omitted.) In other words, assumptions which are not grounded in fact cannot serve as the basis for an expert's opinion: " '[T]he expert's opinion may not be based "on assumptions of fact

without evidentiary support [citation], or on speculative or conjectural factors . . . .' " (*Ibid.*)

In short, speculation is not evidence and cannot support a conviction or, as here, an involuntary commitment. (*People v. Waidla* (2000) 22 Cal.4th 690, 735; *People v. Marshall* (1997) 15 Cal.4th 1, 35.) A reasonable inference may not be based solely upon suspicion, imagination, speculation, supposition, surmise, conjecture, or guess work. (*People v. Raley* (1992) 2 Cal.4th 870, 891.) " ' "A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*Ibid.*)

## III.   The judgment was not supported by substantial evidence of a diagnosed mental disorder

Here, the evidence supporting the trial court's conclusion that Wright suffered from a diagnosed mental disorder— Dr. Musacco's opinion—was not of ponderable legal significance or of solid value. Dr. Musacco's opinion that Wright suffers from hebephilia was based, in principal part, on assumed and hypothesized facts about the 14-year-old and 15-year-old victims' physical and sexual development, and those assumed and hypothesized facts were not supported by the record. In other words, because Dr. Musacco's diagnosis was based on pure speculation and conjecture about the victims' physical and sexual development, it did not possess any evidentiary value.

In its ruling, the trial court wrestled with a number of difficult issues, but it did not address the evidentiary hole at the core of Dr. Musacco's diagnosis—the lack of any information about the victims' physical and sexual development. "When a trial court has accepted an expert's ultimate conclusion without critical consideration of his reasoning, and it appears the

12

conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1136.)

In sum, because Dr. Musacco's opinion did not rise to the " 'dignity of substantial evidence,' " the judgment committing Wright to an indeterminate term as a SVP " 'must be reversed for lack of substantial evidence.' " (*Wise, supra*, 220 Cal.App.4th at p. 1192.)

### DISPOSITION

The judgment is reversed.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J


13