Filed 8/16/22 P. v. Andrade CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>TONY ANDRADE,<br><br>　　Defendant and Appellant. | H048701<br>(Monterey County<br>Super. Ct. No. SS031532A)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on July 26, 2022, be modified as follows:

On page 17, at the end of the first sentence in the first partial paragraph, insert the following footnote:

In a petition for rehearing, Andrade points out that the DSM-5's definition of pedophilic disorder is limited to an interest in prepubescent children and that Sidhu's use of "pubescent" is inaccurate rendering his expert opinion entirely unreliable and mandating reversal. We disagree. Whether Sidhu misspoke or there was a transcription error, Simon accurately described pedophilic disorder as an abiding sexual interest in prepubescent children and diagnosed Andrade with pedophilic disorder. The testimony of a single mental health expert witness is sufficient to support a finding that a person suffers from a severe mental disorder. (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879.)

On page 17, delete the last sentence in the first partial paragraph and replace it with the following sentences:

While there may have been anecdotal evidence of T.D.'s physical development, it is undisputed she was 11 years old at the time of her encounter with Andrade and thus well within the DSM-5's guideline of 13 years or younger. The experts' diagnoses of Andrade with pedophilic disorder based on his interaction with T.D. are not entirely conjectural.

There is no change in the judgment. Appellant's petition for rehearing is denied.

_____
                          Wilson, J.

_____
Bamattre-Manoukian, Acting P.J.

_____
              Danner, J.

People v. Andrade
H048701

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TONY ANDRADE,<br><br>Defendant and Appellant. | H048701<br>(Monterey County<br>Super. Ct. No. SS031532A) |

After a jury determined that defendant Tony Andrade met the criteria describing a sexually violent predator (SVP), as defined by the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.),[1] the trial court committed him to a state hospital for an indefinite term.

On appeal, Andrade argues that there was insufficient evidence to support the jury's finding that he has a diagnosed mental disorder because the expert witness testimony that one or more of Andrade's victims were prepubescent was entirely speculative.

For the reasons explained below, we disagree and will affirm the order finding that Andrade meets the criteria describing an SVP and committing him to the California Department of State Hospitals.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural history

In August 2003, Andrade pleaded guilty to one count of sexual penetration with a foreign object by means of force, violence, duress, menace, or fear (Pen. Code, § 289, subd. (a)(1); count 2) and no contest to two counts of first degree burglary (Pen. Code, § 459; counts 1, 4). Andrade also admitted the allegation that he committed count 1 while he was on bail (Pen. Code, § 12022.1). In October 2003, the trial court sentenced Andrade to 16 years in prison.

On October 28, 2016, the district attorney filed a petition seeking to have Andrade committed as a sexually violent predator under section 6600 et seq. On December 17, 2020, a jury found that Andrade met the criteria of a sexually violent predator as defined in section 6600, subdivision (a), and the court ordered Andrade committed to the California Department of State Hospitals (DSH) for an indeterminate term.

Andrade timely appealed.

### B. Facts

#### 1. The prosecution case

##### a. The sexual offenses

###### i. November 14, 2002 incident

On November 14, 2002, Salinas Police Officer Cesar Trujillo responded to a report of a sexual assault. Trujillo spoke with the victim, 15-year-old Irma Doe, who said that she was assaulted by Andrade at approximately 1:30 a.m. In a recorded interview at the police station, which was played for the jury, Andrade said Irma was friends with his sister and he had attended her quinceañera.[2] Andrade thought Irma was "good lookin[g]" but he had never asked her out or talked to her about being in a relationship. On the night in question, Andrade "had a couple beers" and ended up

---

[2] Irma turned 15 in January 2002. Andrade was born in April 1982 and was 20 at the time of the assault.

2

outside Irma's house. Andrade said he knocked on the door but no one answered.[3] When he tried the doorknob, it opened so Andrade went inside.

Andrade went into Irma's bedroom and when she woke up, he told her not to yell. Andrade thought he wanted to have sex with Irma and he got on top of her "from the waist" up. He began kissing her and grabbing her breasts. Irma was telling him to stop and saying no. Andrade put his hand between her legs and inserted a finger into her vagina. Irma was crying, said he was hurting her, and told him to leave. Andrade was thinking to himself, " 'What am I doing?' " and " '[T]his is not the way you do things.' " Andrade eventually left, but soon came back to Irma's window to apologize to her.

Trujillo testified that when he spoke to Irma she looked "like a normal 15-and-a-half year old" in terms of her physical development and had "clearly gone through puberty." He then said that she "was a child" and in his recollection "somewhat underdeveloped," "short," and appeared to be "younger, around 11." However, Trujillo did not include this information in his written report.

In January 2003, while Andrade was awaiting sentencing, defense counsel retained Dr. James Eddy, a psychologist, to evaluate Andrade. Andrade told Eddy that he had dated a 16-year-old when he was 17, and also dated a 17-year-old when he was 18. Andrade did not have intercourse with either of these girls.

### ii. April 14, 2003 incident

T.D. testified she was 11 years old and living in Salinas with her parents and three brothers on April 14, 2003. T.D. was sleeping in her parents' bed that night when she felt someone shaking her arm and asking in a whisper if she could "go with him . . . to talk." At first, T.D. thought it was one of her brothers, but when she asked who it was, he said

---

[3] Trujillo asked how loudly Andrade knocked and Andrade said "[l]ike medium."

3

" 'It's Tony.' "[4] T.D. told him "No" and that he should "go back to where you came from." T.D.'s mother woke up and asked what was happening. T.D. said that it was Andrade and her mother confronted him, asking what he was doing. Andrade stood up, backed out of the door and left the house.

T.D. testified that, in April 2003, she looked "older" than 11 and her mother told her she "develop[ed] pretty fast." T.D. said she "was always a pretty curvy girl."

Salinas Police Officer Justin Duval arrested Andrade on April 15, 2003, at approximately 3:00 a.m. Duval conducted a recorded interview with Andrade, and that interview was played for the jury.[5] In that interview, Andrade said he did not know T.D. but he "kn[e]w her from somewhere" and previously lived on the same street. Andrade later told Duval he wanted to talk to T.D. about her sister whom he had dated "back in the day."

Andrade said he entered the house through the garage which was unlocked. He went into the bedroom where T.D. was sleeping with her parents and tapped her on the head to wake her. Andrade asked her to go with him to the living room to talk and told her who he was. T.D.'s mother woke up and Andrade left.

Duval told Andrade he did not believe Andrade entered T.D.'s house just to talk to her and asked Andrade what he "wanted to do with [T.D.]." Andrade replied, "I didn't go for her." Duval pressed Andrade further, asking if he wanted to have sex with T.D., touch her, or kiss her, but Andrade denied each of those suggestions. Duval then said

---

[4] T.D. knew Andrade because he had dated her older sister when they were both in high school. T.D.'s sister, who was 10 years older than her, was married and living in Castroville at the time of the incident.

[5] The transcript of the interview does not indicate what time it started, but at the end of the transcript, Duval states that he is concluding the interview at "04:31 hours on 4/15/03." The transcript then includes the following notation: "[End 39 minutes.]" We presume therefore that the interview commenced at or around 3:52 a.m.

that he thought Andrade "wanted to have sex with [T.D.]." The following exchange took place:

"[Duval]: [Y]ou [have] some kind of a problem that makes you do this, okay? You get some kind of sexual urges, alright? And I think you were wanderin' around lookin' for an open door. Lookin' for some place to go into, alright? And you're thinkin' about sex. Is that pretty much what's goin' on here, Tony?

"[Andrade]: Yeah, pretty much.

"[Duval]: Alright. When you found [T.D.] back there in the bedroom, and if you'd had the opportunity to have sex with her, you would have done it. Am I right? I'm right, huh, Tony?

"[Andrade]: Yeah."

Andrade then denied that he intended to have sex with [T.D.] when he entered her home, but his goal was to "see what I could find." Duval said he did not believe that explanation because there were things Andrade could have stolen in the house, but he instead went into the bedroom where T.D. was sleeping. Duval again said that Andrade's "goal was sexual" and Andrade agreed.

Duval then said he did not believe that Andrade had only "done this twice."[6] Duval told Andrade that he knew "of some other incidents where there's been girls that have woken up and found people in their homes . . . just like last night" and Duval believed that Andrade "might be involved in some of these other cases." The following exchange took place:

"[Duval]: I think this has happened more than twice. Is that correct?

"[Andrade]: . . . (inaudible) . . .

---

[6] Duval was apparently also referring to the November 2002 assault of Irma.

5

"[Duval]: Come on Tony. You've been honest so far. You've been upfront. Okay? I think this has happened more than twice. I think there's been other times that this has happened?

"[Andrade]: . . . (inaudible) . . .

"[Duval]: Pretty much? How many other times have you done it?

"[Andrade]: . . . (inaudible) . . . times.

"[Duval]: Three or four times? Has it always been young girls?

"[Andrade]: Yeah."

Duval asked Andrade how long "this" had been going on and Andrade initially said "[a] couple months." When Duval said he knew it had been longer, Andrade responded "[a] couple years."

Duval then asked Andrade about the pipe that officers found in his pocket when he was arrested and whether the white residue in that pipe would test positive as cocaine or crank. Andrade said he did not know and that he found the pipe at work. Eventually, Andrade said that he last used crank a couple of weeks before.

### b. Expert testimony

### i. Dr. Simon's testimony

Dr. Eric Simon, a clinical and forensic psychologist employed by the DSH, was appointed to conduct an SVP evaluation of Andrade. Andrade refused to be interviewed by Simon, so Simon's evaluation was based on his review of "the institutional staff and recommendations summary [*sic*] from 2003; the abstract of judgment from 2003; and the complaint from 2003 and the probation officer's report . . . from 2003; RAP sheets and the Salinas Police Department reports from . . . 2002 [and] 2003."

Simon explained that there are three criteria for determining whether someone is an SVP under the Welfare and Institutions Code: (1) "whether the individual has committed or been convicted of a sexually violent criminal offense against one or more victims"; (2) "whether the individual has a diagnosed mental disorder which predisposes

6

the person to the commission of sexual offenses"; and (3) "whether the individual is likely to commit a new predatory sexually violent criminal offense."

Simon testified that Andrade's conviction for sexual penetration with a foreign object by force or violence met the first criterion. The second criterion involves use of the Diagnostic and Statistical Manual, Edition 5 (DSM-5) to determine whether Andrade has a diagnosed mental disorder which predisposes him to commit sexual offenses. Based on his evaluation, Simon diagnosed Andrade with four such disorders: pedophilic disorder, other specified personality disorder with antisocial features, alcohol use disorder, and stimulant use disorder.

Simon testified the DSM-5 defines "[p]edophilic disorder" as "a deviant sexual arousal pattern to prepubescent children." In making a diagnosis of pedophilic disorder, evaluators "look for . . . some evidence of an enduring pattern of sexual deviant arousal to prepubescent children." This would consist of a "timeline of six months or longer of interest, fantasies, urges or behaviors involving sexual activity with a prepubescent child or children." "[A]s a general guideline," the DSM-5 provides that "prepubescent" refers to children aged 13 or under.

Simon opined that, in this case, Andrade "tried to kidnap and intended to have sex with" an 11-year-old, and when he was interviewed by police about that offense he admitted "that he had committed three to four similar offenses over the previous two years and that he needed help." According to Simon, this was significant as it "provides evidence of an ongoing sexual interest in children. This was not a one-time instance. The other main relevance of this is him stating he needs help. That in my opinion suggests some subjective evidence of his own sense of impairment."

Simon further testified that pedophilic disorder could cause emotional or volitional impairment, meaning that Andrade would have "a defective understanding or appreciation of the consequences" of his behavior (i.e., emotional impairment) and "difficulty in controlling" his behavior (i.e., volitional impairment). Simon opined that

7

Andrade's emotional impairment "results in . . . empathy deficits" toward his victims, and thus he responds inappropriately to "their fear and protest and resistance as he demonstrated." As to volitional impairment, Simon testified that "the strength of [Andrade's] sexually deviant urges . . . results in him lacking . . . sufficient cognitive priority of the legal consequences of his illicit sexual behavior to prohibit him from engaging in it."

Simon described other specified personality disorder, as a "condition [which] . . . has to do with the way a person relates in the world characterologically." The word "characterological" "refers to personality, a person's basic disposition in the world, how they tend to be predisposed to orient and act and think and feel." Pursuant to the DSM-5, other specified personality disorders are ones that do not perfectly fit into one of the other "discrete personality disorders." Simon's diagnosis that Andrade suffers from another specified personality disorder is based on Andrade's criminal records and his records while in custody, both in state prison and at Coalinga State Hospital. These records indicated that Andrade has "a characterological disrespect for the rights of others and a disregard for societal rules." In Simon's opinion, a patient who has both pedophilic disorder and another specified personality disorder with antisocial features would be at increased risk of committing new sex offenses, and the personality disorder increases the risk that the patient acts out on a victim rather than, for example, using child pornography.

Simon's diagnosis that Andrade has alcohol use disorder is based on the "vast amount of data in [Andrade's] records indicating that he has had a problem of using alcohol for much of his life." While in custody, Andrade had been cited for making alcohol in his room and was "often found to be intoxicated." According to Simon, although alcohol use disorder does not "predispose[] [Andrade] to the commission of sex offense[s]," it is an "added risk factor" because it "tends to decrease impulse control and decrease judgment."

8

With respect to stimulant use disorder, Simon testified that Andrade "has used stimulants . . . includ[ing] cocaine and methamphetamine over the course of his life." Because there is no evidence stimulants are available to Andrade at Coalinga State Hospital, Simon opined that this disorder is in "institutional remission." According to Simon, stimulant use disorder is a risk factor for someone who has pedophilic disorder because "stimulants, in particular methamphetamine, . . . tend to increase sex drive and often . . . increase aggressiveness." In the reports Simon reviewed, Andrade gave conflicting statements about his use of methamphetamine at the time of the incidents with the two victims and Simon was concerned that substance use could be a risk factor for Andrade if he were released.

Simon testified that, in his opinion, Andrade has a diagnosed mental disorder that predisposes him to commit criminal sex acts, specifically pedophilic disorder, and meets "all of the criteria for SVP commitment."

On cross-examination, Simon confirmed that the DSM-5's definition of pedophilic disorder uses a "general parameter" of children aged 13 or under "not because there's a strict age cutoff[, but] [i]t's more of a determination of 13 being the normal age of development for children." Simon also agreed that there is variation in how children develop at different ages and variability in how boys and girls develop.

In a hypothetical, Simon was asked to "assume [T.D.] was more developed than an average 11-year-old," and whether that would "lessen the impact of that element" in supporting a diagnosis of pedophilic disorder. Simon responded, "In isolation in the hypothetical it could, yes."

#### ii. Dr. Sidhu's testimony

Dr. Laljit Sidhu, a clinical psychologist and SVP evaluator for the DSH, was appointed to conduct an SVP evaluation of Andrade. Because Andrade refused to be interviewed, Sidhu's evaluation was based on records of Andrade's "sexual offense history" such as "police reports, probation officer reports" as well as any records relating

9

to his "psychological history, if any" while in custody. After reviewing these records, Sidhu diagnosed Andrade with pedophilic disorder and alcohol use disorder.

Sidhu testified that the DSM-5 describes "pedophilic disorder" as "a paraphilia where the individual has a sexual interest, . . . urges, fantasies or some sort of behaviors that are directed towards individuals that are generally 13 years of age or younger." There is a "temporal component" as well and the "urges and the behaviors . . . should occur over around [*sic*] a six-month time period." Sidhu said his diagnosis of pedophilic disorder was supported by two comments Andrade made during his police interview about the incident with T.D. First, Andrade "commented that he had done it before which . . . implied multiple incidents." Second, and more importantly in Sidhu's opinion, Andrade "indicated to the officers that he believed he needed help regarding these behaviors which suggested . . . there was some recognition of a deviant sexuality [involving young girls]."

Sidhu described how pedophilic disorder causes emotional and volitional impairment through the patient's "drive to fulfill those urges." The patient's "brakes are . . . disconnected in a sense" and they do what a person "[n]ormally" would not do, such as "engage in an act of child molestation." As an example of emotional and volitional impairment, Sidhu referenced what occurred with T.D., "an 11-year-old who is sleeping with her parents in bed and he goes into this bedroom. [¶] . . . [¶] And, yet, rather than backing away from the situation he ends up . . . touching this 11-year-old trying to converse with her. And he only leaves because the mother eventually wakes up. [¶] That's a pretty strong drive to have that you're willing to engage with a child who is sleeping with her parents." Despite the fact that Andrade had previously been caught after assaulting a young girl in her bedroom, Sidhu noted that Andrade was not deterred by the presence of two adults in T.D.'s bedroom.

Like Simon, Sidhu testified that Andrade's alcohol use disorder would not cause Andrade to commit sex offenses, but it was a risk factor as it would "exacerbate those

10

urges" and "contribute to that emotional impairment." Andrade's records showed a history of using alcohol with negative consequences, which continued during his time at Coalinga State Hospital.

In Sidhu's opinion, Andrade has a diagnosed mental disorder that predisposes him to the commission of criminal sex acts and meets the criteria for civil commitment as an SVP.

On cross-examination, Sidhu admitted that "an 11-year-old who is developed and is getting curves and . . . has reached menses, would . . . not be a prepubescent child."

### 2. The defense case

#### a. Expert testimony

##### i. Dr. Halon's testimony

Dr. Robert Halon, a clinical and forensic psychologist, was retained by the defense. Halon reviewed Andrade's records and reports, and listened to the testimony presented at trial, including the testimony offered by Simon and Sidhu. In Halon's opinion, there was no evidence in the record since 2003 to support a conclusion that Andrade has a currently diagnosable mental disorder, a deviant sexual preference, or emotional or intimacy deficits. Halon testified that if Andrade had pedophilic disorder, he could not control his urges even while in custody and would have sought out child pornography or created his own if he could not obtain it. According to Halon, the evidence of Andrade's impulsivity, drinking, and fighting while in custody have no bearing on whether he has a sexual disorder or is likely to commit a predatory sexual offense in the future.

Halon testified that, in his opinion, the circumstances of Andrade's offenses involving Irma and T.D. indicated that he was not "a bona fide pedophile," but rather "a kid drunk and on drugs a lot of the time." According to Halon, a pedophile would be "sly" and would not "do things that bring attention to themselves" or "to the parents of the children or teachers." Halon testified that Andrade's behavior was consistent with

11

him being "at the age where his sexual drive physically is high and he doesn't have any sexual partners and he's looking for the easiest ones." Halon acknowledged that the fact that Andrade committed the offense against T.D. while out on bail "would show he's probably back on drugs and alcohol because that would impair his judgment" and that he was "more likely to be dangerous than less likely to be dangerous."

### ii. Dr. Murphy's testimony

Dr. Carolyn Murphy, a clinical and forensic psychologist, testified that "[p]edophilic disorder . . . involves recurrent intense sexually arousing fantasies, urges or behaviors involving prepubescent children that have to go on after the age of 16 and over a period of at least six months." Regarding sexual development, Murphy said that the average age of pubertal onset for girls was "about 11." Because pedophilic disorder requires a "pattern of conduct . . . over a period of at least six months," a single incident of inappropriate sexual activity with an 11-year-old does not support a diagnosis of that disorder. A sexual incident with a 15-year-old "cannot . . . support a finding of pedophilia," because that victim is not prepubescent. When asked if a person in their 20s "with special education and a reading level of fifth grade" indicated to a police officer that he had done something like these incidents with other girls, Murphy responded that, in her opinion, the person's statements would indicate that he "may well have misunderstood the question." It would not, however, signal that the person is a pedophile. Murphy also testified that she reviewed Andrade's custodial records but found nothing to indicate that he has pedophilic disorder.

Murphy was asked about the recorded interview with Duval, in which Andrade agreed that he would have had sex with T.D. if the opportunity arose, said that he had done something similar three or four times previously over the past "couple years," and agreed when Duval asked if it was "always . . . young girls." Murphy opined that, based on "additional information," the statements Andrade made to Duval were "not concern[ing]" to her. On redirect, Murphy clarified that her lack of concern was "with

12

respect to the nature of the statements and the applicability to the diagnosis [of pedophilic disorder]." Murphy explained that she was not concerned by the interview with Duval because Andrade "presented with some rather significant auditory processing issues," an 11-year-old "could well be and would most likely be pubescent[,] and there is no other evidence [of sexual contact with prepubescent children] because the other victim was 15." "[A]s a diagnostician," Murphy did not believe the evidence "reach[ed] the level where it can" support a finding that Andrade had pedophilic disorder. In her opinion, Andrade did not meet the criteria to be classified as an SVP.

## II.   DISCUSSION

### A. Applicable legal principles

#### 1. Overview of SVPA

"Under the SVPA, the state can civilly commit individuals found to be SVPs after they conclude their prison terms." (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646.) At trial on a commitment petition under the SVPA, the prosecution must prove three elements beyond a reasonable doubt: (1) the person has suffered a conviction of at least one qualifying "sexually violent offense," (2) the person has "a diagnosed mental disorder that makes the person a danger to the health and safety of others," and (3) the mental disorder makes it likely the person will engage in future predatory acts of sexually violent criminal behavior if released from custody. (§ 6600, subd. (a)(1); see §§ 6603, 6604; *People v. Shazier* (2014) 60 Cal.4th 109, 126.) "A ' "[d]iagnosed mental disorder" includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others.' (§ 6600, subd. (c).)" (*Shazier, supra*, at p. 126.) "Expert testimony, specifically testimony regarding diagnosis of a current mental disorder, is an important element in an SVPA civil commitment proceeding." (*People v. Roa* (2017) 11 Cal.App.5th 428, 443.)

A person alleged to be an SVP is entitled to a jury trial (§ 6603) at which the attorney petitioning for commitment must prove, "beyond a reasonable doubt, [that] the person is a sexually violent predator" (§ 6604). If the person is found to be an SVP, he or she "shall be committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement in a secure facility designated by the Director of State Hospitals." (§ 6604.)

### 2. Sufficiency of the evidence

" 'In reviewing the evidence sufficient to support a commitment under section 6600, "courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction." [Citation.] "Thus, this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be ' "of ponderable legal significance . . . reasonable in nature, credible and of solid value." ' " ' " (*People v. Wright* (2016) 4 Cal.App.5th 537, 545 (*Wright*).) In conducting our review, an appellate court "may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment." (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.)

It is well established, however, that "[t]he value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 (*Zuckerman*).) "Where an expert bases [their] conclusion upon assumptions which are not supported by the record, . . . or upon factors which are speculative, remote or conjectural, then [their] conclusion has no evidentiary value." (*Ibid.*) A conclusion without evidentiary value "cannot rise to the dignity of substantial evidence." (*Ibid.*)

14

### B. Analysis

Andrade argues that, like the expert's conclusions in *Wright, supra,* 4 Cal.App.5th 537, the prosecution's experts' conclusions in this case were too speculative to amount to substantial evidence to support the jury's verdict. We disagree.

In *Wright, supra,* 4 Cal.App.5th 537, the prosecution's expert psychologist diagnosed the defendant with hebephilia, which he described as " 'sexual interest in pubescent-age children.' " (*Id.* at p. 541.) The expert testified that this diagnosis "is dependent on knowing more than the victim's age—because children mature physically and develop sexually at different ages, it is important to know a victim's appearance" since that appearance "is what is driving the defendant's behavior." (*Id.* at p. 542.) Because the expert did not know anything about the defendant's victims other than their ages, he "had to 'make assumptions that their physical development [wa]s such that [it] meets the definition of hebephilia.' " (*Id.* at p. 543.)

On appeal, the court reversed the trial court's finding that defendant was an SVP for lack of substantial evidence. (*Wright, supra,* 4 Cal.App.5th at p. 547.) The expert's opinion that defendant suffered from a diagnosed mental disorder "was based, in principal part, on assumed and hypothesized facts about the . . . victims' physical and sexual development, and those assumed and hypothesized facts were not supported by the record." (*Id.* at p. 546.) Consequently, the opinion had no evidentiary value because it was "based on pure speculation and conjecture about the victims' physical and sexual development." (*Ibid.*)

The Attorney General argues that *Wright* is distinguishable because the mental disorder at issue in that case—hebephilia—was deliberately excluded from the DSM-5 as it was a controversial diagnosis. (*Wright, supra,* 4 Cal.App.5th at p. 541.) Because the experts in this case diagnosed Andrade with pedophilic disorder, which is included in the DSM-5, the Attorney General contends *Wright* is inapposite.

15

We do not read the outcome in *Wright* to be founded on the controversial nature of the diagnosed mental disorder of hebephilia or its exclusion from the DSM-5. In fact, the court expressly noted that "an SVP's mental disorder need not be listed in the DSM for purposes of commitment." (*Wright*, *supra*, 4 Cal.App.5th at p. 541, fn. 2.) Rather, the court focused entirely on the "evidentiary hole at the core" of the expert's diagnosis. (*Id.* at p. 546.)

Accordingly, we also must examine the prosecution experts' opinions in this case to determine whether they suffer from a similar "evidentiary hole." (*Wright*, *supra*, 4 Cal.App.5th at p. 546.) Reviewing both the expert testimony and the information on which they relied, it is clear that they do not.

At trial, both Simon and Sidhu accurately described the DSM-5 definition of pedophilic disorder as an abiding (over six months or more) sexual interest in prepubescent children, i.e., children aged 13 or younger. In concluding that Andrade suffered from pedophilic disorder, the prosecution's experts relied principally on the charged offense involving T.D., as well as the statements Andrade made during his interview with Duval where he appeared to admit having entered the homes of "young girls" "three or four times."[7]

Andrade's encounter with T.D. supports a diagnosis of pedophilic disorder because it is undisputed that she was under 13 years old at the time. It is true that T.D. testified that, even at age 11, her mother indicated that she "develop[ed] pretty fast as, like my woman features" and that she "was always a pretty curvy girl." While both Simon and Sidhu testified that an 11-year-old who has shown signs of having entered puberty, through physical development or reaching menses, could not be considered "prepubescent" at least for purposes of pedophilic disorder, Sidhu testified that the

---

[7] Duval did not clarify during the interview whether the offenses against Irma and T.D. were included in the "three or four" incidents admitted by Andrade or whether it was "three or four" times in addition to those two.

condition is one where the individual "seek[s] fulfillment in their sexual needs that are directed toward . . . prepubescent/pubescent children." Given this broader range of development, the experts' diagnoses of Andrade with pedophilic disorder based on his interaction with T.D. is not entirely conjectural.

We now turn to whether there was evidence to support the experts' conclusions that Andrade's sexual interest in prepubescent children persisted over a period of at least six months. The prosecution's experts told the jury that Andrade's interview with Duval in which he stated that he had similarly entered the homes of "young girls" "three or four times" over "a couple years" demonstrated such an abiding sexual interest in prepubescent children. Their conclusion is a reasonable inference from the context of the interview, which was instigated by Andrade's entering T.D.'s home with the admitted intent to have sex with her, opportunity permitting.

Duval was interviewing Andrade about the incident with T.D. (age 11), and then said he knew of other similar incidents of "girls that have woken up and found people in their homes" before suggesting Andrade might have been involved in those incidents. We agree with the Attorney General that Simon and Sindhu "could reasonably assume that [Andrade]'s desire to have sex with one young girl under the age of 13 years meant that he had a desire to have sex with more than one such young girl, since he admitted in connection with the [T.D.] assault to having cravings to have sex with young girls."

In addition, Sidhu testified that his diagnosis was based, in large part, on Andrade's admission that he "needed help regarding these behaviors" as this indicated "some recognition of a deviant sexuality at that point." The circumstances of Andrade's interaction with T.D., where Andrade was not deterred by the presence of T.D.'s parents in the same room even though he had recently been arrested for his assault on Irma, further supports the conclusion that Andrade had an abiding interest in young girls.

Because the prosecution's expert's conclusions were supported by the record and were not based on "factors which are speculative, remote or conjectural," we conclude

17

that they provide substantial evidence to support the jury's finding that Andrade meets the definition of an SVP. (*Zuckerman*, *supra*, 189 Cal.App.3d at p. 1135.)

## III. DISPOSITION

The order finding Andrade to be an SVP and committing him to the California Department of State Hospitals is affirmed.

_____
Wilson, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P.J.


_____
Danner, J.


People v. Andrade
H048701